42933. WOOD v. AETNA CASUALTY & SURETY COMPANY et al.

Argued July 10, 1967—Decided September 7, 1967.

R. *Larry Turner*, for appellant.

*Powell, Goldstein, Frazer & Murphy, Frank Love, Jr., Warner R. Wilson, Jr.*, for appellees.

WHITMAN, Judge. ■ The first and second enumerations of error can be discussed together. The first enumeration assigns

as error the findings of the full board that the death of the appellant's husband arose for personal reasons. The second enumeration is that there are "no substantial facts of probative value upon which the deputy director, full board and trial court could have found for the defendants." Consideration of these enumerations requires a review and consideration of the evidence introduced at the hearing.

The evidence shows that at the time of his death Wood was employed as an assistant manager of Alterman Brothers-Big Apple Store on Cascade Road in Fulton County and that there was a parking lot which was a part of the store premises and used by customers and employees of the store for parking purposes.

James Howard Roland, a fellow employee, testified that: "Mr. Wood and myself and a boy named Amos was going to lunch and we left the building, walked into the parking lot and a fellow was sitting in the car. He asked, 'Are you Denny Wood?,' and Denny said, 'I am.' The fellow switched, twisted around in the seat and came up with a pistol and started shooting at him. . . [H]e was shooting out of the car but as I got toward the rear of the car, I turned and I saw Denny was turned to go back, looked like toward the building. . . Q. What did you do? A. . . I turned and headed back toward the building, because at this time, as I did turn, they were already inside the building. . . Q. You know of your own knowledge that both were inside the building at the time? A. Yes, sir, because the store had a big plate glass window. . . Q. When you returned to the store, did you see anything at the store itself? A. When I actually went back into the store, it was all over. The police had already arrived and had the fellow in custody. Q. Was Mr. Wood still in the store? A. At the time, yes, sir. Q. Where was he? A. Laying in the office. . . [H]e was laying on the floor. . . Q. I will ask you whether or not at the time of this incident, confrontation by this man in the parking lot by Mr. Wood, you heard the man who eventually shot Mr. Wood say anything other than 'Are you Denny Wood?' A. No, sir, I don't recall. . . Q. On the day we are talking about . . . did anyone approach Mr. Wood and ask him to

help with a package, with packages, or ask him to do anything else that would be associated with the business? A. I don't know. Q. Didn't you walk out with him? A. We walked out. Q. Do you recall anybody approaching Mr. Wood or you and asking for any assistance? A. No, sir, I don't. Q. Did this man who eventually shot Mr. Wood ask for any assistance of any kind? A. No, sir."

Alma Rebecca Pratt testified that she was working at Big Apple on Cascade on May 19, 1964, as a cashier checker and on further examination testified as follows: "Q. What happened on that particular day at that particular time? A. Well, I think it was about 11 o'clock, somewhere around 11, Denny and Brad and James, I think it was the ones with him had started out to lunch and I didn't hear the shots outside, but Denny come running back and he come over where I was at, I didn't know what was the matter, didn't have any idea what was happening and I thought he was sick and I looked around to get somebody to help him and this boy was standing there with a gun and that just about floored me. Q. Did you see him fire this gun? A. Outside? Q. Inside the store? A. Yes, inside I did. Q. And where in relation to the store itself was this happening? A. Well, Denny had gone in the office when he shot him, but this, when Denny first came in, he came over there where I was at and then he and Joe were in the corner, I don't know when he got over there. Q. Who is Joe? A. Mr. _____ Q. That Mr. Bolton? A. Yes. Q. And this fellow was in there shooting Mr. Wood, did he say anything at all? A. Well, I was begging him not to, I begged him from the time he came in till he went back out not to do it. . . Q. On this particular occasion, May 19, 1964, did you actually see Mr. Wood shot? A. Well, Mr. Wood was in the office and the boy was up on my register leaning over into the office. Q. And he was firing the gun? A. Firing it. . ."

Murray J. Bolt testified that on May 19, 1964, he was relief manager of the Big Apple Store at 938 Cascade at which Mr. Denny Wood was employed as assistant manager; that he didn't notice anything until he heard shooting in the lot and he looked out the window and "saw the fellow standing at the door of his

car firing and Denny was trying to crouch down behind the other cars to get out of the way and he came into the store and was followed by this man. . . Denny came running on around and got behind me . . . and he told me to move out of the way and I told him I couldn't and he told me 'Mister, no need for you to get killed too, Mister,' and Mr. Andrews said move out of the way, I am going to get him if I have to kill you to do it and I told him that he had already hurt him enough why don't he just go on and he said, well, I will kill you too if I have to. . . I opened the door to the office and when I opened the door I had to unlock it with a padlock and as soon as the door came open Denny slid out from behind me right into the floor and pulled it to and locked it and when I turned around he had the cylinder back in his gun, he jumped up on that counter and emptied it [into the office.]"

The wife of the assailant, Mrs. Margaret Joyce Andrews, testified that Wood worked for a couple of months at the same Big Apple Store where she worked, on Gordon Street, before he was transferred. She further testified as follows: "Q. Did Arvil Denny Wood ever go to lunch with you? A. Yes, we went to lunch together. Q. Do you know what prompted him to go to lunch with you? A. We went to lunch around the corner. That was usually where we went all the time, but we went away from the store, usually liked to have somebody to go with us, because West End is sort of a rough section. . . Q. Has your husband ever been confined to a mental institution? A. Yes. Q. When? A. '61. Q. What was he confined for? A. Said he was—I don't know. He was unbalanced at the time. Q. What was the attitude of your husband toward or to your association with other people? A. Well, he was jealous, a jealous person, I couldn't speak to anybody unless I was spoken to. . . Q. What if anything did your husband say concerning relations with other people? A. Well, he just—he was a possessive person. In other words, he wanted to know everything I did. Q. Did he have any objections to the people you associated with? A. Sometimes. Q. How long was he confined to Milledgeville? A. About two or three months. Q. Did he ever ask you any questions concerning your association with Arvil Denny Wood?

A. No, just said he saw me at lunch with him one time. . . Q. Did your husband ever say anything to you concerning Arvil Denny Wood? A. He just asked me who that was I was having lunch with and I told him just someone that worked in the store that just happened to be there, be with him, I didn't want to—Q. Did he ever or not object about other relations, your relations with other people in the store? A. No, he didn't object. He just asked me. Q. Did he make any statements, did he brood about it? A. He didn't like it, I guess he thought I should be eating alone. . ."

On cross examination Mrs. Andrews testified as follows: "Q. And you never identified to your husband the man he had seen you at lunch with? A. He asked me who it was and I told him his name, he worked in the store. Q. You did tell him his name? A. That's right. Q. Did he tell you he had seen you only on one occasion or several occasions? A. Just once. Q. How long was that before May 19, 1964? A. Somewhere around a couple of weeks. . ."

Where a finding of fact by the board is supported by any evidence, such finding is conclusive and must be affirmed by the court on appeal. *Maryland Cas. Co. v. Sanders,* 182 Ga. 594 (186 SE 693). And if an award of the board is authorized by any competent evidence it must be affirmed. *Fidelity & Cas. Co. v. Hodges,* 108 Ga. App. 474 (1) (133 SE2d 406). See also the cases annotated under *Code* § 114-710, catchwords "Conclusiveness of findings."

The evidence does support the finding of the Full Board of Workmen's Compensation that Wood's death arose for reasons personal between him and the asailant. And there is evidence of probative value supporting the decision of the deputy director, the full board and the trial court.

■ The third enumeration of error is that the appellant substantially carried the burden of proof by a preponderance of evidence to show that the death of her husband arose out of and in the course of his employment and the deputy director, the board and the trial court erred in disallowing compensation.

The burden of proof is on the claimant in cases arising under the Workmen's Compensation Act to establish the fact that the

■

employee has sustained an accidental injury such as is contemplated by the Act. *American Mut. Liab. Ins. Co. v. Harden,* 64 Ga. App. 593 (13 SE2d 685); *Maddox v. Buice Transfer &c. Co.,* 81 Ga. App. 503 (59 SE2d 329); *Shelby Mut. Cas. Co. v. Huff,* 87 Ga. App. 463 (74 SE2d 251).

Findings of the board that the claimant has or has not carried the burden of proof are binding on the courts if there is any evidence to sustain them. *American Mut. Liab. Ins. Co. v. Harden,* 64 Ga. App. 593, supra; *American Mut. Liab. Ins. Co. v. Casey,* 91 Ga. App. 694 (1) (86 SE2d 697); *Lee v. General Acc. Group,* 112 Ga. App. 197 (2) (144 SE2d 457). There is evidence to support the finding by the board that the claimant did not carry the burden of proof.

■ Even if the court could disregard the evidence of personal reasons involved in the assault and resulting homicide and the board's finding of fact to that effect, it does not appear that the claimants have otherwise proved a compensable injury. Compensable injuries under the Act are those "by accident arising out of and in the course of the employment." *Code Ann.* § 114-102. The words "in the course of" have relation to the time, place and circumstances under which the accident occurs, while the words "arising out of" have relation to a causal connection between the employment and the injury. *New Amsterdam Cas. Co. v. Sumrell,* 30 Ga. App. 682 (118 SE 786); *Thornton v. Hartford Acc. &c. Co.,* 198 Ga. 786 (32 SE2d 816); *Employers Ins. Co. of Ala. v. Wright,* 108 Ga. App. 380 (133 SE2d 39). "[An accident] . . . 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workmen would have been equally exposed apart from the

employment. The *causative danger* must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." *New Amsterdam Cas. Co. v. Sumrell*, 30 Ga. App. 682, 688, supra. (Emphasis supplied.) The injuries are not required to arise from something peculiar to the employment; the injury is compensable if after the event it is apparent to the rational mind that there is a causal connection between the conditions under which the employment was performed and the resulting injury. *Fidelity & Cas. Co. v. Barden*, 79 Ga. App. 260 (54 SE2d 443); *U. S. Fidelity &c. Co. v. Phillips*, 97 Ga. App. 729 (104 SE2d 542).

Was there a causal connection between Wood's death and his employment? Appellant says that "but for" Wood's employment he would not have been killed by the assailant and relies upon *Employers Ins. Co. of Ala. v. Wright*, 108 Ga. App. 380 (133 SE2d 39) to support this position. The holding in the *Wright* case as summarized in the headnote, is that a public service occupation exposes an employee to the risk of physical danger because he is required "to come in contact and associate with all types of people; and if such hazard becomes an actuality, it may *according to the circumstances and conditions present* constitute a reasonable incident of the employment" and thus be compensable. (Emphasis supplied.) The fact of a public service occupation does not dispense with the requirement that a causal connection be found.

In the *Wright* case, supra, compensation was allowed to a female employee of a laundry "pick-up station" who was raped while in the course of her employment. In the opinion (page 383) the court said: "[T]he particular conditions under which she worked were peculiarly conducive to the eventuality which did occur. She was the sole employee in the establishment at the time of the assault; and the nature of her work required her to go into a secluded part of the premises to pick up parcels

of laundry as customers called for them; and upon the occasion of the assault she had gone into the rear of the premises to pick up a parcel of laundry for the purported customer who followed her there. . . Under the circumstances, we think the conditions of the claimant's employment did not merely provide the time and place for the assault upon her, but that the same increased the risk of the attack, and subjected her to a danger peculiar to the employment. We therefore hold that the assault upon the claimant arose out of her employment."

In the present case the court cannot say, insofar as the record shows, that the character and nature of Wood's employment as an assistant manager in the grocery store exposed him to certain "causative danger" as is required to be shown under the test set forth in the *New Amsterdam* case, supra.

The order of the trial court sustaining the board's denial of compensation is affirmed.

*Judgment affirmed. Bell, P. J., and Pannell, J., concur.*